IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **AILEEN VARGAS-GERENA**<br><br>Plaintiff<br><br>Vs.<br><br>**CARIBE PHYSICIANS PLAZA CORPORATION D/B/A CARIBBEAN MEDICAL CENTER ; CONTINENTAL INSURANCE COMPANY; DR. JOSE A. ORTIZ-FELICIANO** and the conjugal partnership of Dr. Ortiz-Feliciano and his wife Jane Doe **; A, B & C INSURANCE COMPANIES; JOHN DOE AND RICHARD ROE**.<br><br>Defendants | **CIVIL NO:** *15-1514*<br><br><br><br>MEDICAL MALPRACTICE<br><br><br>JURY TRIAL DEMANDED |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**TO THE HONORABLE COURT**:

**COMES NOW** plaintiff, through the undersigned attorney and very respectfully set forth and request:

### I.   PARTIES

1.   Plaintiff, **AILEEN VARGAS-GERENA**, is of legal age, a domiciled resident of the State of Florida, United States of America, and the sister of the late Joel Vargas- Gerena ("Joel").  Plaintiff appears on her personal behalf for past, present, and future claims of mental and emotional anguish and sufferings, resulting from medical malpractice suffered by her beloved brother

Joel, while tendered by defendants as claimed hereafter.

2.  Co-defendant, **CARIBE PHYSICIANS PLAZA CORPORATION D/B/A CARIBBEAN MEDICAL CENTER**, (hereinafter referred to as "**HOSPITAL**"), is to plaintiff best belief and understanding, a legal entity organized under the laws of the Commonwealth of Puerto Rico, who at all times herein pertinent, was the owner and/or proprietor; and/or administrator; and/or operator of a medical institution located in Fajardo, Puerto Rico, where medical services were rendered to Joel Vargas Gerena (the patient).  Co-defendant "HOSPITAL" is also the employer and/or contractor and/or supervisor of the medical and nursing personnel who attended Joel while at HOSPITAL .

3.  "HOSPITAL" is accountable to the plaintiff for all negligent acts and/or omissions incurred by physicians assigned to treat, render, and tend on Joel at Hospital during the periods at issue.  Such legal accountability ensues from the doctrines of direct, vicarious, and corporate liability as set forth in the law and applicable case law, inasmuch as such physicians were selected, granted medical privileges, and assigned to treat, tend, and care for patient at "HOSPITAL" and the additional fact that Hospital economically benefitted from their work.

4.  Co-defendant, **CONTINENTAL INSURANCE COMPANY**, hereinafter referred as "CNA Insurance," is deemed to be a duly organized entity engaged in the insurance business who, at the time of the incidents

asserted herein, had in full force and effect an insurance policy for co-defendant Hospital, covering incidents alleged in this Complaint.

5. Co-defendant, **DR. JOSE A. ORTIZ FELICIANO** (hereinafter referred to as "**DR. ORTIZ-FELICIANO**") is to plaintiff's best belief and understanding, a duly licensed medical physician and resident of the Commonwealth of Puerto Rico, who (as of the dates particularly recited in this complaint) managed, treated, and cared for Joel.  Plaintiff holds that Dr. Ortiz-Feliciano have been married as of the date of the occurrences alleged in this complaint, and that the conjugal partnership of Dr.  Ortiz-Feliciano and his currently unidentified wife **JANE DOE** is also to be held responsible for the damages sought herein, since said partnership benefits from the doctor's economic gains.

6. Co-defendant "**A, B, & C INSURANCE COMPANIES**" are deemed to be duly organized entities engaged in the insurance business who, at the time of the incidents asserted herein, could have had in full force and effect any type of insurance policies for any of the named defendants and/or any of the unknown persons, corporations, and/or  doctors.

7. Co-defendant **John Doe and Richard Roe** are so designated to identify any unknown person who might have partaken in Joel Vargas Gerena's care, treatment, and management, or who could have furnished him negligent treatment  either by act or omission, and who could be liable to plaintiff herein.

## II.  JURISDICTION AND VENUE

8. This Honorable Court is vested with jurisdiction to entertain the instant cause of action pursuant to 28 U.S.C. Sec. 1332, as diversity of jurisdiction is invoked pursuant to the fact that plaintiff is a resident of the State of Florida, defendants are residents of the Commonwealth of Puerto Rico, and the matter in controversy exceeds (exclusive of interests and costs) the jurisdictional sum of $75,000.00.

9. This Honorable Court has venue pursuant to 28 U.S.C. Sec. 1391 whereas as described herein, the claims asserted in this action arose in this judicial district.

## III.  TOLLING OF STATUTE OF LIMITATIONS

10. On May 9, 2014 and June 16, 2014, plaintiff tolled the statute of limitations in the present action, by personal and certified mail notifications. In consideration to the fact that defendants are deemed jointly and severally accountable to the plaintiff for all claims herein portrayed, the timely claims tolling effect is applicable to all defendants herein.

## IV.  FACTUAL ALLEGATIONS

11. The facts and events which plaintiff alleges in this complaint ensued within the municipality of Fajardo, Puerto Rico.

12. Joel Vargas-Gerena ("Joel"), a 33-year-old male, with history of diabetes mellitus, epilepsy, cancer of the pelvis as a child and, who received

radiotherapy in 1981, arrived on July 12, 2013, at 9:50 p.m., at the Emergency Department of the Hospital Caribbean in Fajardo, Puerto Rico, with complaints of abdominal pain, vomiting, and headache.

13. At the Emergency Department Joel underwent a CT scan of the abdomen and pelvis, and was diagnosed with small bowel obstruction, which was consulted with defendant surgeon, Dr. Jose A. Ortiz Feliciano.

14. While at the Emergency Department, with an inserted nasogastric tube attached to intermittent suction and on orders from Dr. Ortiz-Feliciano, Joel was admitted to hospital on July 13, 2013. On admission to the hospital, Joel had normal blood levels of hemoglobin, hematocrit, BUN, and creatinine.

15. On July 13, Joel was assessed in consultation by Dr. Arraut, a specialist in internal medicine, for emergency surgery clearance. That day, Joel was nothing by mouth (NPO) and connected to intermittent suction.

16. On July 14, afternoon, Joel was taken to the operating room by Dr. Ortiz-Feliciano, where he underwent exploratory laparotomy, under general anesthesia. Preoperative laboratories were normal: WBC: 11.8; Neut. 9.9; Neut. 84.6%; Hgb. 16.8, Hcrt. 48.3 Plaq. 246.

17. The exploratory surgery took 3 hours and 50 minutes. The post-operative diagnosis was: small bowel intestinal obstruction, perforated Ileum, incidental appendectomy. The pathology report included four specimens consisting of: (1) piece of small intestine 35 cm x 3.00 cm with 1.5 cm

perforated area (no tumors); (2) 4 bowel segments ranging in size from 2.0 cm to 10.0 x 1.5 x 2.5 cm (not tumors); (3) mesenteric tissue 11.0 x 9.0 x 2.0 cm; (4) Appendix 5.0 x 0.5 cm no fecalith or perforation was found.

18.   Due to Joel's low levels of oxygen saturation, on conclusion of surgery, he was intubated, connected to mechanical ventilator and transferred to Intensive Care Unit (ICU) with postoperative orders to include NPO and antibiotic Zosyn 3.375 mg IV q. 6 hr.

19.   On July 15, in his day Post Operated (Post OP) Number #1, Joel was NPO with distended abdomen.  Blood laboratories that day, at 7:21 am, were: WBC: 6.6, Neut. 5.6 Neut. 85.1%, Hgb. 13.2; Hcrt. 37.8; Plaq. 254.  The hemoglobin had dropped from 16.8 to 13.2 and hematocrit from 48.3 to 37.8.

20.   On July 16, Post OP # 2, Joel was assessed in consultation by the pulmonologist, Dr. Ferrer; extubated and placed in a 35% venturi oxygen mask.  On this day, no laboratories were done and Joel began presenting high temperature (fever) of 38 degrees and higher, in spite of receiving Zozyn 3.375 mg IV Q.6 hrs.

21.   During the following ten (10) days, from July 16 to July 26, Joel had fevers that reached 39.4.

22.   On July 17, Post Op # 3, Joel was NPO and presented bilateral diminished lung sounds on auscultation, distended and hard abdomen, fever and diminished peristalsis.  No laboratories were performed that day.

23. On July 18, Post Op # 4, Joel continued NPO. That day, laboratories revealed a significant decrease in hemoglobin levels (8.5) and hematocrit (24.5), followed by fever, pain, and distended abdomen. Despite this setting, at 3:00 p.m., Joel received a full liquid diet and was transferred from ICU to a regular room with order of full liquids diet and oral medications.

24. On July 19, Post Op. # 5, Joel continued with fever, pain, distended abdomen, and again no laboratories were performed.

25. On July 20, Post Op. # 6, at 7:42 am, Joel's laboratories revealed anormalities. The WBC was 13.3; Neut. 10.8; Neut. 81.7%; Hgb. 9.4; Hcrt. 27.1; Plaq. 308. He was still feverish, but that day no medical orders were written.

26. On July 21, Post Op # 7, Joel had pain, distended abdomen, anxiety, respiratory distress, vomiting "coffee ground emesis" and spent all day with an over 39 degrees fever. Joel was placed NPO and ordered Intramuscular medications for pain and nausea. Again, no laboratories were performed that day.

27. On July 22, Post Op # 8, at 9:21 a.m., Joel's blood labs reveled the following anormalities: WBC: 15.8, Neut. 14.3; Neut. 90.6%; Hgb. 8.6; Hcrt. 24.8 and Plaq. 378. BUN and CREAT 26: 1.72 Potassium: 3.1; CHLORINE: 92, CO2: 29; CALCIUM: 6.9.

28. On July 22, Joel continued with fever and presented green

discharge and fetid abdominal malodor. At 7:54 a.m., medical orders were recorded to discontinue Zosyn and start new antibiotics, Vancomycin I gm IV q. 12 hours and Cleocin 900 mg IV q. 12 hours.  However, the first dose of these new antibiotics was received 37 hours later, at 9:00 p.m. the next day (7/23/13).

29.   On July 23, Post Op. # 9, Joel continued with fever and was disoriented at intervals.  Nurses notes reported that day, reveled that Joel's abdominal wound festering was malodor and abundantly excreted.  According to the 3:00 p.m. nursing notes, these events were reported to Dr. Ortiz-Feliciano, who neglected to give any orders.

30.   On July 24, Post Op # 10, Joel continued with fevers, no laboratories were performed and at 9:30 p.m., Dr. Ortiz ordered a full liquid diet.

31.   On July 25, Post Op # 11, Joel continued with fever (39.2), distended abdomen and pain.  Laboratories at displayed reveled critical values: BUN: 45, CREAT: 2.36; Potassium: 3.2; CHLORINE: 94; $CO_2$: 31. At 10:16 AM Joel's hemoglobin was 8.1; Hcrt. 23.3 Plaq. 582.  At 8:00 p.m., Dr. Ortiz-Feliciano ordered type and cross for 2 units of PRBC transfusion.  The first transfusion began at 2:30 a.m., on July 26.

32.   On July 26, Post Op. # 12, Joel continues with fever, abdominal distension, and fistula draining excreta.  Joel appears nervous and his family

disturbed.  At 9:54 p.m., a nurse notified Dr. Ortiz-Feliciano, who neglected go to the hospital and simply states that "knew this was going to happen" and that he would speak to family next day.

33.   On July 27, Post Op # 13, Dr. Ortiz-Feliciano wrote NPO order.  At 9:00 a.m., Dr. Ortiz-Feliciano wrote the first order of Total Parenteral Nutrition (TPN): "D / e Clinimix 4.25 + electrolite at 100 ml / hr", which began the next day at 3:30 p.m. The nutritionist, who firstly evaluated Joel on this day, recommended that Dr. Ortiz Feliciano consider a central line catheter for TPN.

34.   On July 28, when Joel firstly begun on TPN, 14 days had elapsed since his abdominal surgery.

35.   That day, July 28, antibiotics were changed to Vancomycin 1 Gm IV Q.24 hrs and Cleocin 900 mg IV Q. 12 hrs. A abdominal-pelvic CT scan with contrast was ordered.  Laboratories, at 8:37 p.m. showed ; BUN: 97, CREAT: 3.47, Potassium: 3.0, chloride 85, CO2: 31 and CALCIUM: 7.0

36.   On July 29, Post Op #15, a CT abdominal-pelvic scan was performed and revealed: "lung bases with atelectasis consistent notwithstanding right-sided pleural small effusion is noted." Joel's urinary catheter presented hematuria drenage and at 3:00 p.m., Joel was found disoriented at intervals, with distended abdomen and fever.  At 11:30 a.m., Dr. Ortiz-Feliciano ordered put on "hold" the Vancomycin and at 8:45 p.m. ordered to put on "hold" the TPN .

37. On July 30, Post Op #16, Joel was NPO, Cleocin was discontinued and Zosyn 3.375 mg IV q. 6 hr. was ordered.

38. On July 31, Post Op #17, Joel continued NPO with shortness of breath, low blood pressure and tachycardia. This days re-evaluation by the nutritionist once again recommends "consider placing central line for TPN; activate and start TPN protocol." However this recommendations were never implemented by Dr. Ortiz-Feliciano.

39. On July 31, Joel's laboratories continued with critical values: PT 39.9, PTT 37.8. The WBC was: 14.4 ,Neut. 12.4; Neut. 86.6%; Hgb. 13.4; Hcrt. 39.6; Platelets 656.

40. On August 1, Post Op #18, Joel continues NPO, with difficulty breathing, low blood pressure, and tachycardia. That night he vomited "coffee ground" and an emergency attending physician (Dr. Rodriguez) ordered Type and Cross for 2 units of Plasma (FFP) and transfuse as soon as available; 1000 SS .09% full drip and D5W / SS + 0.9% KCL 150 mg at 20 ml / hr; Vit K 10 mg in 100 NSS infuse at 50 ml / hr; CBC, BMP, liver profile, PT, PTT, INR in AM.

41. The morning of August 2, Post Op #19, Joel's laboratories revealed critical values: WBC: 17.7; Neut. 16.0; Neut. 90.1%; Hgb. 8.8; Hcrt. 25.2; Plaq. 606. BUN and CREAT 137: 5.23. At 11:35 a.m., Joel displayed profuse abdominal bleeding. Joel was alert and oriented, but with a languid mood,

pale, with shortness of breath, restless with a distended abdomen.  At 6:45 p.m. Joel vomited excreta.

42. That night , at 8:00 p.m., Joel presented shortness of breath, low blood pressure, low pulse, and  anxiousness.  He was intubated and cardio-pulmonary resuscitation was instituted, but he was pronounced dead at 9:50 p.m.

43. Laboratories that night, at 8:04 p.m.,  showed: WBC: 26.6; Neut. 23.4; Neut. 97.9%; Hgb. 5.3; Hcrt. 14.9; Plaq. 633.  Laboratories at 8:23 p.m. BUN: 126; CREAT: 5.76; Potassium: 4.8; CHLORINE: 92; CO2: 11; CALCIUM: 8.1

44. The Death Summary indicates that Joel developed "high output enterocutaneous fistula."  Joel's Death Certificate indicates that the immediate cause of his death was sepsis, due to enterocutaneous fistula.

45. Plaintiff, who during her brothers anguish was practically constantly at his side at defendant hospital, witnessed how he underwent progressive health deterioration culminating in his needless, cruel, and lamentable death.  On many occasions, she struggled with the medical and nursing staff, shriving so that her brother was appropriately attended, all of which caused her intense suffering and emotional anguish.

## V. NEGLIGENCE AND DAMAGES

46. Allegations contained in the preceding paragraphs are adopted by

reference as they may be applicable and as fully reproduced herein.

**Count I. Dr. Ortiz-Feliciano Negligence:**

47.     Plaintiff holds that Dr. Ortiz-Feliciano was negligent in the care and treatment of her beloved brother Joel, inasmuch as he failed to care for and treat patient in accordance with the standard of care and skill required of and ordinarily exercised by the average qualified physician engaged in medical practice at a professional level, such as that in which that doctors was engaged.  Co-defendant, Dr. Ortiz-Feliciano, violated the standard of care applicable to those in his profession during his post-surgery care and management of Joel's surgery, on failing to timely diagnose and treat his condition as well as in not speedily following his early signs of infection.  Dr. Ortiz-Feliciano deviated from the acceptable standard of care and post-operative medical follow-up.

48.     Dr. Ortiz-Feliciano negligence comprised, but were not limited to: failure to examine properly and diagnose patient's medical condition; failure to provide, recommend, and refer the patient to timely and appropriate diagnostic studies, care, consultation, and treatment; failure to properly follow-through and/or recommend the appropriate follow-up of the patient, and the failure to monitor his condition; failure to gave early enteral feeding/nutrition; failure to prevent Enterocutaneous Fistula (ECF); failure to treatment ECF;  failure to correct electrolyte/fluid deficit;  failure to adequately

delivery nutrition; failure to effectively control sepsis; mistimed surgical intervention; failure to control fistula output; failure to effectively isolate fistula; failure to consult with a infectious disease specialist for management and treatment; failure to consult a internist due to that the consulted did not write progress notes and saw him only until July 16, when Joel was still in ICU; failure to consult a pulmonologist due to that the consulted only saw him until July 16, when Joel was extubated and was still in ICU and did not write progress notes.

49. As a direct and proximate result of the negligence of co-defendants plaintiff's brother suffered progressive health deterioration culminating in his needless, cruelty, and lamentable death; and likewise was allowed to endure severe physical pain, anguish, and suffering due to delay in the diagnosis and treatment of his condition.

50. As a direct consequence of doctors' negligence, plaintiff suffered intense emotional, psychological, and anguish arising from the loss of his beloved brother, for which she demands judgment against the defendant in the amount that will justly compensate for her damages, together with interest, costs, and attorneys fees of this action.

### Count II. Negligence - Caribbean Medical Center

51. Plaintiff likewise asserts that Caribbean Medical Center is accountable for her damages, granted that they are vicariously responsible for

the acts and omissions of hospital personnel and doctors.  In the present case, hospital personnel grossly ignored and disregarded patient's symptoms which patently evidenced Enterocutaneous Fistula, thereby incurring in flagrant negligence through hospital personnel acts and omissions which culminated in decubitus ulcers and in placing the patient in eminent risk and eventual death.

52. Having the plaintiff's brother suffered severe life threatening conditions, defendant hospital neglectfully failed to properly and timely manage his condition, thus allowing his health to deteriorate and eventually end in his death.  Due to hospital's personnel and doctor's negligence, patient was denied the opportunity to survive an otherwise recoverable health condition.

53. The negligent actions and omissions of hospital personnel and doctors staff, caused plaintiffs' brother untimely death and her preceding sufferings due to the substandard quality of medical care afforded and to the gross negligence or willful misconduct of hospital personnel.

54. All such negligence on behalf of hospital personnel constitutes a legal basis for hospitals accountability for plaintiff's suffering, and anguish arising from the loss of his beloved brother.

**Count III.  Insurers Liability**

55. It is plaintiff's contention that the gross medical negligence of defendant physician and hospital was the  direct cause of her brother's

suffering, health deterioration, and ensuing death and thus of her mental and emotional anguish, all which constitutes legal basis for liability and recovery of damages against them, their conjugal partnerships, and their respective insurance carriers, as commonly and jointly (solidarity) accountable to the plaintiff in consideration to the provisions of issued medical malpractice insurance policies and provisions of applicable laws of the Commonwealth of Puerto Rico, in particular, Articles 1802 and 1803 of Title 31 (31 L.P.R.A. Sections 5141 and 5142); Article 20.030 of the Puerto Rico Insurance Code, 26 L.P.R.A. sec. 2003 and recognized by the Puerto Rico Supreme Court.

## VI.  DAMAGES

56.   Plaintiff repeats in their entirety all previous allegations.

57.   The proximate cause of plaintiffs damages is the fault, gross negligence, medical and hospital malpractice of each and every defendant as set forth herein, for which defendants are jointly and severally liable to the plaintiff.

58.   The proximate and sole cause of plaintiff's damages were the combined medical and individual negligence of defendants, resulting from substandard medical treatment, unnecessary delay in treatment all of which resulted in plaintiff's brother suffering, deterioration and death, which in turn caused plaintiff's sufferings and anguish.  These sufferings emerging from plaintiff's powerless observance of her brother's gradual deterioration, physical

pain, distress and eventual death are valued at ONE MILLION DOLLARS ($1,000,000.)

## VII.   JURY TRIAL

59.    Plaintiff request trial by jury on all issues.

**WHEREFORE**, plaintiff respectfully requests this Honorable Court that it grants the relief requested herein, together with a reasonable amount for attorney's fees, interests, and costs in the prosecution of this action.

**RESPECTFULLY SUBMITTED**

In Fajardo, Puerto Rico, this April 30, 2015.

> **RUIZ & REYES LAW OFFICES**
> Attorneys for the Plaintiff
> PO BOX  1232 ◆ Fajardo, P. R.  00738-1232
> Tel.   (787) 636-9108 ◆ (787) 801-8754
> Fax:  (787) 801-6986
> E-mail:  ruiz@ruizreyeslaw.com
>
> *S/Ricardo Ruiz Díaz*
> **RICARDO RUIZ DIAZ**
> USDC-PR:  118613